UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| CARL SPITKO and ELIZABETH GOETZ SPITKO | : | |
| Debtors | : | Bankruptcy No. 04-18836bif |

_____

| | | |
|---|---|---|
| HOWARD T. GLASSMAN, trustee | : | |
| Plaintiff | : | |
| v. | : | |
| HEIMBACH, SPITKO & HECKMAN | : | |
| Defendant | : | Adversary No. 05-0258 |

_____

.................................................

OPINION

.................................................

The plaintiff trustee, Howard T. Glassman, filed an adversary proceeding

against the defendant law firm, Heimbach, Spitko & Heckman (hereinafter "HSH"),

asserting three causes of action.  Count I seeks to avoid prepetition transfers to HSH as

preferential under 11 U.S.C. § 547, totaling $68,500.  Count II asserts a fraudulent

conveyance claim based upon those same prepetition transfers under federal law, 11

U.S.C. § 548(a)(1)(A), in the amount of $68,500.  Count III also raises a fraudulent

conveyance claim but under state law, Pennsylvania's Uniform Fraudulent Transfer Act

("PUFTA"), 12 Pa. C.S.A. §§ 5150 et seq., via 11 U.S.C. § 544, in the amount of $93,500.[1]

       HSH filed an answer opposing any relief and now has filed an amended motion for partial summary judgment.  Included with that motion are various affidavits and exhibits.  HSH seeks to dismiss the preference count and count II, as well as strike a portion of the state law fraudulent conveyance count.  (The defendant concedes that, for a component of the constructive fraudulent conveyance claim in count III, there are material facts in dispute rendering summary judgment inappropriate.)

       The trustee opposes any summary judgment and believes himself entitled to trial on all three claims.  He contends that there are material facts in dispute as to all counts, and offers his own affidavit in support thereof.

## I.

       Upon my review of the admissions in the pleadings, the undisputed facts identified in the parties' pretrial statement, as well as the affidavits and exhibits submitted by HSH, along with the trustee's affidavit, I conclude that the following material facts are not disputed.

       The chapter 7 debtors are Carl Spitko and Elizabeth Goetz Spitko, husband and wife.  They filed a joint chapter 7 bankruptcy petition on June 29, 2004.  At the time

---

[1]And, although not expressly mentioned in the complaint, to the extent the trustee can set aside these prepetition transfers under either section 544, 547 or 548, the trustee presumably seeks judgment against the defendant pursuant to 11 U.S.C. § 550.  See generally In re Burns, 322 F.3d 421, 427-28 (6th Cir. 2003).

of their bankruptcy filing, Carl Spitko was the sole shareholder and president of

Maintech, Inc., a subchapter S corporation. Carl and Elizabeth Spitko also were, at the

time of filing, the sole shareholders of Sentek, LLC, with Carl serving as its president.

David Spitko is Carl's brother. David Spitko earned a law degree in 1985,

worked for a Philadelphia law firm as an associate attorney, and then was one of the

founding partners in 1992 of HSH, located in Allentown, Pennsylvania. HSH specialized

in labor and employment law on behalf of employers. On June 29, 2004, when the

Spitkos' bankruptcy case was filed, the law firm had four partners.

From its inception, HSH represented Maintech in employment matters. In

2002, Maintech engaged HSH to represent it in various commercial disputes, as the

corporation was experiencing financial difficulties involving claims against it by

Wachovia Bank. Indeed, in May 2003, Wachovia confessed judgments against Maintech

and the debtors, as Carl and Elizabeth Spitko were guarantors of Maintech's loans held by

Wachovia. Carl Spitko was also a guarantor of Maintech's obligations to a creditor

known as De Lage Landen, which purportedly was also pressing Maintech for payment.

In May 2003, the debtors engaged Albert Ciardi, III, Esquire, to represent

them as "workout" counsel. Mr. Ciardi avers that he recommended to the debtors that

they use HSH for certain legal matters related to Mr. Ciardi's representation, because

HSH's hourly rate was "substantially" lower than his. He also swears that he

recommended to the debtors that they establish escrow retainers with HSH to pay for such

services.

Sometime during the spring of 2003, the debtors received an income tax

refund on Maintech's behalf (since it was a subchapter S corporation) in the amount of

3

$379,456 for tax year 2002.  Beginning on June 5, 2003, the debtors commenced a series

of payments to HSH that are the subject of the instant adversary proceeding.  These

payments, which are undisputed, were made as follows:

| Date of Payment | Amount Paid to HSH |
|---|---|
| 6/5/2003 | $25,000 |
| 8/5/2003 | $15,000 |
| 9/1/2003 | $20,000 |
| 1/28/2004 | $15,000 |
| 3/22/2004 | $18,500 |

See Joint Pretrial Statement, Uncontested Facts ## 6-10.

Attached as an exhibit to HSH's motion for summary judgment is a hand-

written account of HSH's "IOLTA Trust Account for payments made by Carl & Lisa

Spitko ('Debtors') to the Trust Account."  See Exhibit 'A' to Defendant's Amended

Motion for Partial Summary Judgment.  In addition, HSH billed either Maintech or

Sentek for legal services rendered, and attached redacted copies of those billings records

as exhibits to the affidavit submitted by David Spitko.  Those bills were paid by the

debtors through the transfers just listed.  The defendant provides the following accounting

for those payments:

| Date Payment Applied to Invoice | Payments Into Escrow | Invoice Amount | For Billable Time In | Balance in Escrow |
|---|---|---|---|---|
| 6/6/03 | $25,000.00 | | | $25,000.00 |
| 6/10/03 | | ($10,965.30) | Maintech Bill # 84 ~ May 2003 | $14,034.70 |

4

| | | | | |
|---|---|---|---|---|
| 7/24/03 | | ($5,075.00) | Maintech Bill # 85 ~ June 2003 | $8,959.70 |
| 7/24/03 | | ($8,466.50) | Sentek Bill # 01 ~ June 2003 | $493.20 |
| 8/5/03 | $15,000.00 | | | $15,493.20 |
| 8/7/03 | | ($5,146.50) | Maintech Bill # 86 ~ July 2003 | $10,346.70 |
| 8/7/03 | | ($7,380.00) | Sentek Bill # 02 ~ July 2003 | $2,966.70 |
| 9/30/03 | | ($2,846.95) | Maintech Bill # 89 ~ August 2003 | $119.75 |
| 9/30/03 | | ($532.50) | Sentek Bill # 04 ~ August 2003 | ($412.75) |
| 10/2/03 | $20,000.00 | | | $19,587.25 |
| 10/2/03 | | ($5,112.26) | Maintech Bill # 90 ~ September 2003 | $14,474.99 |
| 10/02/03 | | ($120.00) | Sentek Bill # 05 ~ September 2003 | $14,354.99 |
| 11/25/03 | | ($6,252.73) | Maintech Bill # 91 ~ October 2003 | $8,102.26 |
| 11/25/03 | | ($120.00) | Sentek Bill # 06 ~ October 2003 | $7,982.26 |
| 12/31/03 | | ($5,279.00) | Maintech Bill # 93 ~ November 2003 | $2,703.26 |
| 12/31/03 | | ($480.00) | Sentek Bill # 07 ~ November 2003 | $2,223.26 |
| 1/30/03 | $15,000.00 | | | $17,223.26 |
| 2/3/04 | | ($5,835.00) | Maintech Bill # 94 ~ December 2003 | $11,388.26 |
| 2/3/04 | | ($30.00) | Sentek Bill # 08 ~ December 2003 | $11,358.26 |
| 2/27/04 | | ($6,975.00) | Maintech Bill # 95 ~ January 2004 | $4,383.26 |

5

| 3/29/04 | $18,500.00 | | | $22,883.26 |
|---|---|---|---|---|
| 4/5/04 | | ($8,825.51) | Maintech Bill # 99 ~ February 2004 | $14,057.75 |
| 4/5/04 | | ($2,729.00) | Maintech Bill # 100 ~ March 2004 | $11,328.75 |
| 4/5/04 | | ($60.00) | Sentek Bill # 10 ~ March 2004 | $11,268.75 |
| 5/14/04 | | ($692.00) | Maintech Bill # 101 ~ April 2004 | $10,576.75 |
| 5/14/04 | | ($105.00) | Sentek Bill # 11 ~ April 2004 | $10,471.75 |
| 6/3/04 | | ($874.50) | Maintech Bill # 102 ~ May 2004 | $9,597.25 |
| 6/3/04 | | ($60.00) | Sentek Bill # 12 ~ May 2004 | $9,537.25 |

See Defendant's Reply to Trustee's Response to Summary Judgment Motion at 7-8.

Finally, I note that in opposing partial summary judgment, the trustee offered his own affidavit in support. In it, Mr. Glassman contends that he cannot evaluate the reasonableness of the fees charged by HSH due to the redacted nature of certain exhibits: HSH's billing records.[2] And, to the extent the redaction is based upon the assertion of attorney-client privilege, he (Mr. Glassman) waives that privilege. He also believes that the debtors previously agreed to permit him to see unredacted billing information.

---

[2]At argument, HSH asserted that it needs to protect the information redacted because Carl Spitko has been criminally indicted. The defendant agrees to provide the trustee with unredacted copies of its billing records so long as the trustee signs a confidentiality agreement; the trustee apparently has declined to enter into such an agreement.

6

II.


Federal Rule of Bankruptcy Procedure 7056 incorporates Fed. R. Civ. P.

56, the summary judgment rule, into bankruptcy adversary proceedings.  Summary

judgment avoids the expense and delay of an unnecessary trial when no material facts are

in dispute and one of the parties is entitled to prevail on the merits.  See, e.g., Goodman v.

Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038

(1977).  The standard for determining the applicability of summary judgment under Rule

56 is well established.  As the Third Circuit Court of Appeals observed:

> Summary judgment is appropriate when the moving party is
> entitled to judgment as a matter of law and there is no genuine
> dispute of material fact....  In order to defeat "a properly
> supported summary judgment motion, the party opposing it
> must present sufficient evidence for a reasonable jury to find
> in its favor." Groman v. Township of Manalapan, 47 F.3d
> 628, 633 (3d Cir. 1995) (citing Anderson v. Liberty Lobby,
> Inc., 477 U.S. 242, 250-52, 106 S.Ct. 2505, 2511-12, 91
> L.Ed.2d 202 (1986)).  In essence, the non-moving party must
> demonstrate a dispute over facts that might affect the outcome
> of the suit.  Id. Moreover, in reviewing the record, we must
> give the non-moving party the benefit of all reasonable
> inferences....

Hampton v. Borough of Tinton Falls Police Dept., 98 F.3d 107, 112 (3d Cir. 1996).

The application of these general principles is affected by the allocation of

the evidentiary burden of persuasion were the dispute to proceed to trial.  That is, a trial

court's approach to summary judgment is influenced by whether the party seeking

summary judgment would have the burden of persuasion at trial.  See generally

Coquellette, et al. 11 Moore's Federal Practice 3d, §§ 56.03[4], 56.13[3] (2006).  This

approach was well summarized in <u>Adams v. Consolidated Rail Corp.</u>, 1994 WL 383633,

at *1-*2 (E.D. Pa. 1994):

> The Supreme Court articulated the allocation of burdens
> between a moving and nonmoving party in a motion for
> summary judgment in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317
> (1986).  The Court held that where the movant is the
> defendant, or the party without the burden of proof on the
> underlying claim, the movant still has the initial burden of
> showing the court the absence of a genuine issue of material
> fact, but that this does not require the movant to support the
> motion with affidavits or other materials that negated the
> opponent's claim.  <u>Id.</u> at 323. In contrast, where, as here, "the
> party moving for summary judgment is the plaintiff, or the
> party who bears the burden of proof at trial, the standard is
> more stringent."  <u>National State Bank v. Federal Reserve
> Bank</u>, 979 F.2d 1579, 1582 (3d Cir. 1992).  To sustain its
> initial burden under such circumstances, the movant must:
>
> > "support its motion with credible evidence . . .
> > that would entitle it to a directed verdict if not
> > controverted at trial. In other words, the moving
> > party must show that, on all the essential
> > elements of its case on which it bears the burden
> > of proof at trial, no reasonable jury could find
> > for the non-moving party."
>
> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir.
> 1993). . . . If the movant makes such an affirmative showing,
> it is entitled to summary judgment unless the nonmoving
> party, in response, comes forward with significant, probative
> evidence demonstrating the existence of a triable issue of fact
> . . . .

(citations omitted); <u>accord</u> <u>In re White</u>, 243 B.R. 498, 501 n.4 (Bankr. N.D. Ala. 1999).

Here, defendant HSH is the party seeking summary judgment.  Insofar as

Count I is concerned, the trustee has the evidentiary burden of establishing all of the

elements found in section 547(b), while the defendant would only have the burden of

persuasion to demonstrate affirmative defenses under section 547(c).  <u>See</u> 11 U.S.C. §

547(g).  With Count II, under section 548, the trustee also has the burden of proof to

demonstrate that the transfers were actually fraudulent.  See, e.g., In re Fruehauf Trailer

Corp., 444 F.3d 203 (3d Cir. 2006).  However, the defendant/transferee would have the

evidentiary burden to establish good faith under section 548(c).  See In re Hannover

Corp., 310 F.3d 796, 799 (5th Cir. 2002).

      The allocation of the evidentiary burdens under Pennsylvania law for

purposes of Count III is not clear, as will be discussed below.  Some decisions impose the

burden of persuasion upon the plaintiff to demonstrate all of the elements of constructive

fraud under PUFTA.  Other decisions opine that, in certain instances, there is a shifting of

the evidentiary burden back to the transferee to demonstrate reasonably equivalent value.

If a fraudulent conveyance is established, then a transferee would have the burden to

demonstrate a good faith defense under state law.  See In re Burry, 309 B.R. 130, 135

(Bankr. E.D. Pa. 2004).  For purposes of this summary judgment motion, I conclude that

HSH has at least an evidentiary burden of production, if not one of persuasion, in

demonstrating reasonably equivalent value.

      As noted earlier, in applying the above-mentioned standard for summary

judgment, "[the court must] view the underlying facts and all reasonable inferences

therefrom in the light most favorable to the party opposing the motion."  Pennsylvania

Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); see also Helen L. v. DiDario, 46

F.3d 325, 329 (3d Cir.), cert. denied sub nom. Pennsylvania Secretary of Public Welfare

v. Idell S., 516 U.S. 813 (1995); Valhal Corp. v. Sullivan Associates, Inc., 44 F.3d 195,

200 (3d Cir. 1995); Goodman v. Mead Johnson & Co., 534 F.2d at 573.  Moreover, the

moving party bears the burden of proving that no genuine issue of material fact is in

dispute.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10

(1986).  Once the movant has carried its initial burden, however, the nonmoving party

"must come forward with 'specific facts showing that there is a genuine issue for trial.'"

Id. at 587 (quoting Fed. R. Civ. P. 56(e)).  As explained by the Third Circuit:

> At the summary judgment stage of proceedings, if the movant
> —in this case the Defendants—can point to the absence of
> any factual support for one of [the] essential elements [of the
> complaint], then the non-movant, bearing the burden of
> persuasion at trial, must introduce specific facts showing a
> need for trial, pursuant to Fed. R. Civ. P. 56(e).  See Celotex,
> 477 U.S. at 322-24, 106 S. Ct. 2548.  If the non-moving party
> fails to go beyond conclusory allegations in its pleadings and
> to produce specific facts indicating that there is a genuine
> issue for trial, summary judgment will be granted in favor of
> the moving party.

Annulli v. Panikkar, 200 F.3d 189, 198-99 (3d Cir. 1999) (overruled on other grounds by

Rotella v. Wood, 528 U.S. 549 (2000)) (citations omitted).

In essence, defendant HSH argues that the trustee has failed to "go beyond

conclusory allegations" in support of his claims that the prepetition payments made by the

debtors to the law firm were avoidable transfers under federal or state law.

III.

A.

I turn first to the preference claim, Count I.  Therein, the trustee seeks to

avoid as preferential all payments made by the debtors to HSH between August 5, 2003

and March 29, 2004, totaling $68,500.  The only issue raised by the defendant for

purposes of summary judgment is whether the undisputed facts demonstrate that the

10

trustee could prove at trial all of the elements found in 11 U.S.C. § 547(b).  HSH

acknowledges that material facts would be in dispute regarding any affirmative defenses

under section 547(c).

   The concept of an avoidable preferential transfer represents a longstanding

congressional determination that creditors should not be permitted, either intentionally or

unintentionally, to recover more from the debtor than other creditors with similar claims

by virtue of transfers made in their favor just prior to the debtor's bankruptcy filing.  At

the time the preferential transfer is made, there may be nothing improper about it under

state law.  See Matter of Nelson Co., 959 F.2d 1260, 1266 (3d Cir. 1992).  However, once

the bankruptcy petition is filed, a trustee may avoid or set aside the transfer as preferential

pursuant to 11 U.S.C. § 547.

   Congress envisioned two overriding policies which would be enhanced by

the trustee's ability to avoid preferential transfers.  First, similar creditors would be

treated equally in their receipt of distributions from the debtor's assets.  Second, creditors

would be discouraged from racing against each other to dismember the debtor, since an

earlier recovery could later be set aside as preferential.  H.R. Rep. No. 95-595, 95th

Cong., 1st Sess. at 177-78 (1977).

   The scope of a preferential transfer, as it is defined by section 547,

embodies the balancing of a number of policy choices.  See generally Thomas H. Jackson,

Avoiding Powers in Bankruptcy, 36 Stan. L. Rev. 725 (1984).  These are initially

articulated by the provisions of section 547(b), which contain the essential elements of a

preference as Congress chose to define it.  Congress then recognized additional policy

considerations by virtue of section 547(c).  Certain transfers which might at first appear

11

preferential, because they meet all the requirements of section 547(b), should not be so

viewed for various reasons.

While section 547 identifies those transfers which may be avoided, section

550 governs the trustee's ability to recover, for the benefit of the debtor's estate, transfers

so avoided.  Section 547(b) provides as follows:

> (b) Except as provided in subsection (c) of this section, the
> trustee may avoid any transfer of an interest of the debtor in
> property-
>
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt
>> owed by the debtor before such transfer was
>> made;
>> (3) made while the debtor was insolvent;
>> (4) made-
>>> (A) on or within 90 days before the
>>> date of the filing of the petition; or
>>> (B) between ninety days and one
>>> year before the date of the filing of
>>> the petition, if such creditor at the
>>> time of such transfer was an insider;
>>> and
>> (5) that enables such creditor to receive more
>> than such creditor would receive if-
>>> (A) the case were a case under
>>> chapter 7 of this title;
>>> (B) the transfer had not been made;
>>> and
>>> (C) such creditor received payment
>>> of such debt to the extent provided
>>> by the provision of this title.

Section 550(a) provides in pertinent part that:

> [e]xcept as otherwise provided in this section, to the extent
> that a transfer is avoided under section . . . 547 . . . , the
> trustee may recover, for the benefit of the estate, the property
> transferred, or, if the court so orders, the value of such
> property, from -

12

>(1) the initial transferee of such transfer or the
>entity for whose benefit such transfer was made;
>or
>(2) any immediate or mediate transferee of such
>initial transferee.

HSH raises two separate challenges to the elements required by section 547(b).  First, it maintains that the undisputed facts demonstrate that none of the pre-bankruptcy payments the law firm received from the debtors were for or on account of antecedent debts, as mandated by section 547(b)(2).  Second, it argues that all of the transfers occurred more than 90 days before the debtors' bankruptcy filing, and that HSH is not an "insider" subject to the one-year reach-back period found in section 547(b)(4).

B.

Although the term "antecedent debt" is not defined by the Bankruptcy Code, see generally 11 U.S.C. §101, a debt is defined as a "liability on a claim."  11 U.S.C. § 101(12).  A debt is generally characterized as antecedent "when the debtor becomes legally bound to pay before the transfer is made."  In re CVEO Corp., 327 B.R. 724, 728 (Bankr. D. Del. 2005) (quoting In re The Fonda Group, Inc., 108 B.R. 956, 959 (Bankr. D.N.J. 1989); see also In re First Jersey Securities, Inc., 180 F.3d 504, 510-11 (3d Cir. 1999).  In other words, the preference statute does not apply to prepetition transfers made to an entity that was not a creditor of the debtor at the time the transfer was made.

In arguing that none of the transfers involved payment for or on account of antecedent debts, HSH contends that all of the debtors' payments were intended as retainers, to be held in escrow by the law firm and applied to payment for future services.

13

See generally In re Armstrong, 234 B.R. 899, 906 (Bankr. E.D. Ark. 1999); In re Baltic

Associates, L.P., 1994 WL 791634, at *4 (Bankr. E.D. Pa. 1994).  The trustee counters

that material facts are in dispute because HSH has not produced any escrow or retainer

agreements made by the Spitkos.  HSH responds that the trustee never sought production

or discovery of any such documents, the discovery period has long since expired, and the

trustee has the burden of proof to demonstrate the preference element established by

section 547(b)(2).  Therefore, it had no obligation to incorporate such agreements in its

motion for summary judgment.

     Apparently, Pennsylvania law recognizes two general types of retainer

agreements, with the second category containing two subcategories:

> [N]umerous authorities have noted the existence of two broad
> categories of retainer agreements.  The first is sometimes
> referred to as the classic retainer.  In a classic (or general)
> retainer agreement a client agrees to pay a fixed sum in
> exchange for the attorneys promised availability to perform
> legal services that may arise during a specific period of time.
> An essential characteristic of the classic retainer is that it is
> earned entirely by the attorney upon payment, with the client
> retaining no interest in the funds thereafter. . . .
>
> In contrast to the classic retainer is the special retainer, which
> itself comes in two varieties: a security retainer and an
> advance fee retainer.  In the case of the security retainer, the
> attorney holds the same to secure payment of fees for future
> services.  The funds do not constitute a present payment but
> instead remain the property of the Debtor until the attorney
> applies it to charges for services actually rendered . . . .  In the
> advance fee retainer arrangement, the attorney receives
> payment in advance for contemplated legal services and
> depletes the prepaid fund as services are rendered. Advance
> fee retainers differ from security retainers in that ownership of
> the funds is intended to pass to the attorney at the time of the
> payment.

In re Renfrew Center of Florida Inc., 195 B.R. 335, 338-39 (Bankr. E.D. Pa. 1996).

14

HSH's assertion that it received only retainer payments from the debtors would not, even if unrebutted, establish a per se absence of a transfer for or on account of an antecedent debt. A "security retainer" could well represent a transfer for an antecedent debt.[3]

The affidavit of Mr. Ciardi that he "advised Carl and Lisa to make advance payments [to HSH]" does not, by itself, establish the type of retainer agreement entered into by the debtors. The billing information provided as exhibits to HSH's amended motion suggests that the payments may have been designed as security retainers. HSH avers that it held funds in escrow for the debtors, and as services were rendered by HSH it subtracted the amounts charged from the debtors' funds.

Moreover, even without deciding the type of retainer received by the defendant, the facts offered by HSH in support of summary judgment, and those noted in the chart included above in the factual recitation, suggest that at least a portion of the payments from the debtors could be interpreted as applied by HSH against antecedent debts. For example, a portion of the debtors' $25,000 June 2003 payment clearly was applied by HSH against services provided by the firm in May 2003. And a small portion of the August 5, 2003 payment clearly was applied for services billed before that date.

Moreover, if I give the trustee the benefit of inferences on this issue, it appears that some services were provided by HSH but simply were not billed before additional payments were received. This could possibly constitute payment of antecedent debt. See In re Enivid, Inc., 345 B.R. 426, 457 (Bankr. D. Mass. 2006). And, if the funds

---

[3]Of course, transfers that constitute a "security retainer" may not be avoidable as preferential by virtue of section 547(b)(5), but that issue is not presently before me.

15

held in escrow are treated as withdrawn on a first-in first-out basis,[4] then there would be

payments that would be credited against those earlier services.

A retainer used to pay for prior, unpaid services, is a transfer for an

antecedent debt.  See In re Hennings Feed and Crop Care, Inc., 2000 WL 33961389

(Bankr. C.D. Ill. 2000).  Accordingly, considering the affidavits and documents provided

by HSH, and giving the trustee the benefit of all inferences, I cannot now conclude that

the trustee would be unable to meet his burden at trial under section 547(b)(2).


C.


The defendant's second challenge to Count I concerns section 547(b)(4),

and that contention is more persuasive.  None of the transfers sought to be avoided by the

trustee as preferential occurred during the 90-day period prior to the debtors' bankruptcy

filing.[5]  Thus, the trustee can only prevail if HSH is deemed an "insider," thereby

extending the reach-back period under section 547(b)(4) to one year.[6]

Under the statutory definition, whether an individual or entity will be

considered an "insider" for the purpose of  preference analysis depends upon the legal

_____

[4]As a general rule, in tracing the origins of funds withdrawn from a bank account,
Pennsylvania applies the rule established in Clayton's Case, 1 Merivale 572 (Ch. 1816), that the
funds first deposited are the funds first withdrawn.  See City of Pittsburgh v. Rhodes, 230 Pa.
397, 399 (1911).

[5]The last challenged payment was made on March 22, 2004 and the Spitkos filed
their bankruptcy petition on June 29, 2004.  The 90-day reachback period ended on March 31st.

[6]Accordingly, the trustee acknowledges that he cannot seek to avoid the June 6,
2003 transfer to HSH as preferential, because it occurred more than one year prior to the debtors'
bankruptcy filing on June 29, 2004.

status of the debtor.  See 11 U.S.C. § 101(31).  Here the debtor is an individual, therefore

section 101(31)(A) applies.  That section of the Code states that the term "insider" of an

individual includes: (1) relatives of the debtor or general partners of the debtor; (2) a

partnership in which the debtor is a general partner; (3) a general partner of the debtor; or

(4) a corporation in which the debtor is an officer, director, or person otherwise in

control.  See 11 U.S.C. § 101(31)(A)(i)-(iv).

         HSH does not fall within any of the statutorily defined categories of insider

provided under section 101(31)(A).  While David Spitko is a relative of the debtor Carl

Spitko, as that term is defined in the Code,[7] and is thus an insider, the trustee's preference

action seeks to avoid payments made to HSH, an entity apparently separate and distinct

from David Spitko.[8]

         As the definition of insider uses the term "including," the statutory

examples of insiders would not be all-inclusive.  See 11 U.S.C. § 102(3) ("'includes' and

'including' are not limiting"); see also Matter of Krehl, 86 F.3d 737, 741 (7th Cir. 1996);

Butler v. David Shaw, Inc., 72 F.3d 437, 443 (4th Cir. 1996); In re Schuman, 81 B.R.

---

         [7] Section 101(45) defines "relative" as an "individual related by affinity or
consanguinity within the third degree as determined by the common law, or individual in a step
or adoptive relationship within such third degree."

         [8]My use of the phrase "entity separate and distinct" is not intended to imply that
David Spitko would not be personally liable for any judgment rendered against HSH.  The
trustee's complaint seeks to avoid transfers made to HSH.  It does not name any partner or
employee of the firm in an individual capacity.  Nor does the complaint allege that HSH is the
alter ego of David Spitko.  Compare In re Weddle, 353 B.R. 892 (Bankr. D. Idaho 2006).
Pleadings and documents filed in the proceeding refer to David Spitko as a partner in HSH.  It is
not clear whether HSH was organized as a general partnership or some other form allowable
under Pennsylvania law.  If HSH is a general partnership, its four partners could be individually
liable for claims against the law firm.

583, 585-86 (B.A.P. 9th Cir. 1987); In re Newcomb, 744 F.2d 621, 625 n.4 (8th Cir.

1984).  For this reason, application of the term "insider" has some flexibility and should

consider all relevant facts.  See In re Polk, 125 B.R. 293, 296 (Bankr. D. Colo. 1991).

However, simply because David Spitko is an insider of the debtors and (assuming that

HSH was a general partnership) HSH would be considered an insider of David Spitko, it

does not follow that an insider of an insider of the debtor should be treated as  an insider

of the debtor for purposes of section 547(b)(4):

> Had Congress wanted to extend per se insider status to
> insiders of insiders, it knew how to do it.  Section 101(31)(E)
> provides that an "affiliate" of a debtor is an insider, as is an
> "insider of an affiliate as if such affiliate were the debtor[.]"
> Thus, the statute specifically includes insiders of insiders,
> when that is the intent of Congress.  That Congress did not
> include such language in § 101(31)(B) shows its intent not to
> expand per se insiders to include insiders of relatives of
> insiders.  See BFP v. Resolution Trust Corp., 511 U.S. 531,
> 537 . . . (1994) (presumed that Congress acted intentionally
> when it included particular language in one part of a statute
> but omitted it from another).
>
> Particularly in light of the conclusive presumption of
> preferential treatment that arises from a determination that an
> entity is a per se insider, there is no justification for expanding
> the definition of per se insider beyond what is plainly
> contained in the statute.  To do so would result in adding
> language to the statute that is not there, which it is not within
> the province of the court to do.  See Lamie, 540 U.S. at 537,
> 124 S. Ct. at 1032.

In re Enterprise Acquisition Partners, Inc., 319 B.R. 626, 632 (B.A.P. 9th Cir. 2004).

When the term "insider" first appeared in the Bankruptcy Code, as part of

the 1978 Bankruptcy Reform Act, the legislative history described the term as "one who

has a sufficiently close relationship with the debtor that his conduct is made subject to

18

closer scrutiny than those dealing at arms length with the debtor." H.R. Rep. No. 95-595,

95th Cong., 2d Sess. 312 (1977), reprinted in 9 Bkr-L Ed § 82:15 (1979).

Given that legislative history, it is appropriate to consider whether the

undisputed facts demonstrate whether HSH's dealings with the debtors were not at arm's

length. See In re Demko, 264 B.R. 404, 408 (Bankr. W.D. Pa. 2001). "The emphasis [for

insider determination] is on the nature of the relationship between debtor and the other

person, especially on whether their relationship gave the other person the power or

influence to have a debt owed to it repaid." Id. Thus, when seeking to determine non-per

se statutory insider status, a court should consider the closeness of the relationship

between the parties and decide whether that closeness affected the arm's-length nature of

the transaction, or provided some level of control that the transferee had over the debtor.

See In re Holloway, 955 F.2d 1008 (5th Cir. 1992); In re Enterprise Acquisition Partners,

Inc., 319 B.R. at 633. A mere debtor-creditor relationship, by itself, is insufficient to find

that the transferee is an insider of the debtor. Demko, 264 B.R. at 408. Thus, non-

statutory insider status is a fact-intensive inquiry that must be determined on a case-by-

case basis. Id.

Decisional law examining insider status in those instances not specifically

provided for in section 101(31) can generally be divided into two groups: "(1) those cases

that involve a business or commercial relationship; and (2) those that involve a personal

or pseudo-familial relationship." In re Phongsavath, 328 B.R. 895, 897 (Bankr. N.D. Ga.

2005). In order to impose insider status in the personal context, the debtor and the

transferee typically must have a close relationship that is familial in nature. See

Phongsavath, 328 B.R. at 897. Courts are less likely to impose insider status in a non-

19

business context when the relationship is based solely upon friendship. See id. at 898
(and cases cited therein).

A creditor in a business relationship with the debtor, as occurred in this
proceeding, may be considered an insider when that creditor had the ability to assert more
control than other creditors, made management decisions for the debtor, directed work
performance, and directed payment of the debtor's expenses. See In re Winstar
Communications, Inc., 348 B.R. 234, 279 (Bankr. D. Del. 2005). "There must be
day-to-day control, rather than some monitoring or exertion of influence regarding
financial transactions in which the creditor has a direct stake." Id. (emphasis removed);
see also In re Radnor Holdings Corp., 353 B.R. 820, 841 (Bankr. D. Del. 2006).

Attorneys have not generally been considered insiders of their debtor-
clients. See In re Sullivan Haas Coyle, Inc., 208 B.R. 239, 244 (Bankr. N.D. Ga. 1997);
In re Lemanski, 56 B.R. 981 (Bankr. W.D. Wis. 1986); In re Durkay, 9 B.R. 58 (Bankr.
N.D. Ohio 1981). Whenever an attorney has been found to be an extra-statutory insider,
that status has been imposed because of a relationship with the debtor that transcended the
normal attorney-client boundaries. Compare In re Broumas, 135 F.3d 769 (Table), 1998
WL 77842 (4th Cir. 1998) (attorney is an insider) with In re Oliver, 142 B.R. 486 (Bankr.
M.D. Fla. 1992) (attorney is not an insider); In re Lemanski, 56 B.R. 981 (Bankr. W.D.
Wisc. 1986) (same); In re Durkay, 9 B.R. 58 (Bankr. N.D. Ohio 1981) (same).

For example, in Broumas, the debtor had engaged the same attorney for 15
years. During that time, the debtor acted as the banker for his attorney. Broumas, 1998
WL 77842 at *1. The debtor was given signature authority and access to the attorney's
bank accounts and the law firm's accounts. Id. The attorney and the debtor made loans

20

to one another and pledged each other's credit.  Id.  They were also investigated by the

Securities Exchange Commission for their joint participation in a stock purchasing

scheme.  Id.  During their 15 year attorney-client relationship, the court found that the

parties also were close friends, principal and agent, and landlord and tenant.  Id. at *8.

Thus, given the peculiar nature of their relationship, that attorney could properly be

classified as an insider for preference purposes under the Code.  Id.

In In re Oliver, a chapter 11 case, the debtor brought an adversary

proceeding against his former attorney to avoid purportedly preferential transfers under

section 547 of the Code.  See Oliver, 142 B.R. 486.  After years of representing the

debtor, the attorney had brought suit against it in state court to collect past due fees.  Id. at

487-88.  Pre-bankruptcy judgment was entered for the attorney against the debtor, and the

state court ordered that all shares in a corporation controlled by the debtor were to be

transferred to the attorney in satisfaction of the judgment.  Id.  The debtor filed for

bankruptcy and then claimed that the prepetition transfer of shares was a preferential

transfer to an insider and should be avoided accordingly.  Id.  In rejecting this contention,

the bankruptcy court reasoned that:

> To accept the proposition urged by the Debtor, one might
> contend that any attorney who represented a debtor
> pre-petition for several years, and became intimately involved
> with and privy to the debtor's affairs, would be vulnerable to
> a preference attack when bankruptcy intervenes by a Trustee
> who would, no doubt, seek to recover all payments made to
> the attorney during the preceding year under the insider
> provision of the Bankruptcy Code. To carry the interpretation
> of the term "insider" to its logical extreme, as urged by the
> Debtor, would be clearly absurd and illogical, and lacks any
> support either in the Code or in the legislative history of the
> Section by case law.

21

Id. at 490.

In <u>Matter of Lemanski</u>, chapter 7 debtors executed a partial assignment of their mortgage to the defendant law firm in order to "collateralize" an unsecured balance of $1,914.33 owed to the law firm for legal services previously rendered and to provide security for services to be rendered in the future.  <u>See</u> <u>Lemanski</u>, 56 B.R. at 982-83.  The trustee sought to avoid the transfer (<u>i.e.</u>, mortgage assignment) as a preference to an insider under section 547(b) of the Code.  The court reasoned that "[a]n attorney is an insider if as a matter of fact, he exercises such control or influence over the debtor as to render their transactions not arms-length."  <u>Id.</u> at 983.  The evidence in <u>Lemanski</u> showed that the firm had represented the debtors for at least ten years, and even though it had encouraged the debtors to grant it security for an unpaid debt, the transactions were at arm's length and at no time did the firm "exercise the requisite 'high degree of influence or control' necessary for insider status."  <u>Id.</u>  Accordingly, the court held in favor of the defendant law firm.

In <u>In re Durkay</u>, the debtor and the defendant-attorney knew each other for more than 25 years.  <u>See</u> <u>Durkay</u>, 9 B.R. at 59.  The defendant represented the debtor, the debtor's wife, and several of the debtor's companies for many years.  <u>Id.</u>  During this representation, the debtor conveyed a quit-claim deed for his residence to a corporation owned and controlled by the attorney.  <u>Id.</u>  The transfer was intended to repay delinquent counsel fees.  <u>Id.</u>  After the transfer, the debtor remained in the residence and was obligated to pay rent to his attorney.  <u>Id.</u>  When the debtor failed to pay rent, the defendant initiated eviction proceedings, which were settled for $5,000.  <u>Id.</u> at 60.  The attorney no longer represented the debtor at the time of the bankruptcy filing.  <u>Id.</u> at 59.

22

The trustee sought to avoid the $5,000 settlement payment as a preferential transfer.  Id. at 60.  Focusing on the relationship between the parties at the time of the transfer, the court held that the attorney was not an insider because of the arm's-length nature of their relationship.  Id. at 61.

In the present matter, the trustee contends that as David Spitko, a partner in HSH, is the brother of the debtor, HSH should be considered an insider for preference purposes.  The trustee alleges that the challenged transfers were not a series of arm's-length business transactions between HSH and the debtor; rather they were transfers between brothers in contemplation of a bankruptcy filing.  The trustee further observes that HSH holds an unusual relationship with the Spitkos because it represented Carl Spitko as well as his corporations, and is also representing Carl Spitko's father in another adversary proceeding brought by the trustee.

HSH counters that it had been engaged to represent Maintech in labor matters for many years, that appropriate agreements securing the firm's representation were executed, and that Maintech was billed for these services in the usual manner of the firm's business.  When Maintech and the debtors began to experience financial difficulties, HSH started to represent the debtors and their companies, Maintech and later Sentek, in negotiations and litigation with creditors because of its low hourly rate.  On the advice of the debtors' workout attorney, HSH began to charge retainer fees for its services.  Bills were prepared and the fees deducted from the retainers held in escrow by HSH.  The retainer funds were replenished by the debtors when the funds held in trust diminished.

23

In response to HSH's motion for summary judgment on Count I, the trustee has offered no documents, deposition transcripts, admissions, answers to interrogatories or affidavits suggesting that HSH exerted control over the debtors to hire it, or to pay its fees, or that the payments were not arm's-length transactions. While it is undisputed that there is a familial relationship between David Spitko and the debtor, as they are brothers, and that HSH is involved in other adversary matters connected to the debtors' bankruptcy case, the trustee has not presented any evidence suggesting that, at trial, HSH would be found to have the requisite degree of control over the debtors that would enable it to be categorized as an insider.

HSH was a four partner law firm, in existence for more than 12 years at the time of the Spitkos' bankruptcy filing. There is no inference that the debtors, or their corporations, were its main clients. There is no inference that David Spitko controlled the law firm. There was no inference that HSH charged the debtors or their corporation more than it charged other clients for similar services. Thus, it is not sufficient for the trustee to maintain that the entire firm should be considered an "insider" simply because one partner is related to the debtor and because he believes that the challenged payments were made in contemplation of bankruptcy, rather than for actual legal services rendered. Indeed, the trustee has not referred to any reported decision in support of this contention.

As the trustee's opposition to summary judgment on Count I relies upon his pleadings, bare assertions, conclusory allegations, or suspicions to support his claim of insider statuts, HSH is entitled to summary judgment as to preference Count I.

24

IV.

Although the trustee raises two fraudulent conveyance claims (Counts II and III) concerning overlapping transfers, his complaint relies upon two discrete theories. In Count II he alleges, pursuant to 11 U.S.C. § 547(a)(1)(A), see Complaint, ¶ 26, that the debtors transferred $68,500[9] to HSH within one year of their bankruptcy filing "with actual intent to hinder, delay, or defraud Debtors' other creditors."  Complaint, ¶ 28.  In Count III, however, he avers that the "[d]ebtors paid at least . . . $93,500[10] to [HSH] without receiving a reasonably equivalent value in exchange . . . ."  Complaint, ¶ 32.  This claim is based upon Pennsylvania's Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. C.S.A. §§ 5150, et seq.  Complaint, ¶¶ 33-34.

I turn first to whether HSH is entitled to summary judgment on the trustee's claim of actual fraud under section 548(a)(1)(A).

A.

As I noted earlier, the plaintiff trustee has the burden to demonstrate a fraudulent transfer under section 548(a)(1) by a preponderance of the evidence.  See In re Fruehauf Trailer Corp., 444 F.3d 203, 210-11 (3d Cir. 2006).  Because rarely will a

---

[9]That is the sum of the transfers from August 4, 2003 through March 29, 2004.

[10]This is the sum of the transfers made to HSH between June 6, 2003 and March 29, 2004.

25

transferor or a transferee acknowledge that a transfer was intentionally fraudulent,

circumstantial evidence is sufficient to meet this burden:

> Courts often look to "badges of fraud" as circumstantial evidence. . . . These "badges" include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer.

Frierdich v. Mottaz, 294 F.3d 864, 870 (7th Cir. 2002) (citations omitted); accord In re

Rickard, 2006 WL 3859239, at *2 (Bankr. E.D. Pa. 2006).  Some courts focus upon

slightly different indicia:

> The record also supports the avoidance of the transfer pursuant to 11 U.S.C. § 548(a)(1)(A) as having been made with actual intent to hinder, delay, or defraud creditors.  Intent to hinder, delay, or defraud creditors is rarely admitted by a debtor. Therefore, a court may consider circumstantial evidence establishing badges of fraud. . . .  Relevant factors include whether the transfer was to an insider; whether the debtor retained possession or control of the property after the transfer; concealment of the transfer; pending or threatened litigation against the debtor at the time of transfer; a transfer of substantially all of the debtor's assets; absconding by the debtor; removal or concealment of assets; reasonably equivalent value in exchange for the transfer; the debtor's insolvency at the time of the transfer; the proximity in time of the transfer to the incurrence of a substantial debt; and a transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to an insider of the debtor. . . .  Transfers to family members are subjected to particularly close scrutiny. The relationship of the parties in conjunction with other circumstances often provides compelling evidence of fraud.

26

In re Kelsey, 270 B.R. 776, 782 (B.A.P. 10th Cir. 2001) (citations omitted); see also In re

Fetla's Trading Post, Inc., 2006 WL 538802, at *12 (Bankr. N.D. Ill. 2006).[11]

---

[11]Pennsylvania fraudulent conveyance law establishes a slightly different mix of indicia as relevant to a determination of actual fraud:

> In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

(continued...)

Although issues of fraudulent intent are not readily amenable to summary

judgment, a plaintiff who asserts an actual fraudulent conveyance and opposes summary

judgment must come forward with some evidence to demonstrate that material facts are in

dispute:

> Although denominating the claim as one under § 550, the
> underlying theory of Claim # 2 is § 548, seeking to avoid the
> truck's transfer as actually and/or constructively fraudulent.
> As to actual fraud (§ 548(a)(1)(A)), Debtor's affidavit
> specifically denies intent to hinder, delay or defraud,
> explaining the purpose of the grant of the security interest was
> to secure future fees.  The other affidavits support this.
> Although questions of intent are usually inappropriate for
> disposition on summary judgment . . ., this does not mean that
> such questions must be left to the trier of fact when the
> nonmoving party presents no evidence to support her claim. . .
> Plaintiff has presented no countervailing evidence of actual
> intent to hinder, delay or defraud, and there is not "significant
> probative evidence," Anderson, supra at 249, 106 S.Ct. at
> 2510, in the record to raise a genuine issue of fact on this
> issue.  Summary judgment is thus appropriate in favor of
> Defendants on the "actual fraud" count of Claim # 2.

Trunnell v. Brookshire, 2007 WL 963337, at *2 (Bankr. D. Or. 2007); accord In re J.R.

Deans Co., Inc., 249 B.R. 121, 139 (Bankr. D.S.C. 2000):

> Pursuant to § 548, a transfer of interest of Debtor's property
> may be avoided if it occurred within one year of the filing of
> the petition, and if one of two requirements is met.  First, the
> transfer may be set aside if it was made "with actual intent to
> hinder, delay, or defraud" any creditor.  The Trustee has
> presented no evidence of fraudulent intent to sustain a
> conclusion that the rental payments constituted a fraudulent
> transfer.  To the contrary, the evidence establishes that Debtor
> occupied the premises for which payments were made and
> even continued to occupy said premises when it began

---

[11](...continued)
12 Pa. C.S.A. § 5104(b).

defaulting on the rent beginning in November of 1996.
Therefore, it is clear that Debtor was not fraudulently
dispersing its money; rather, it was paying rent for the
premises that HRE leased to it.  Furthermore, as discussed
earlier in the Order, there was no fraudulent motive in
connection with the transfer of real estate from Debtor to
HRE; and, the fact that the spin-off concluded in HRE's
owning the premises and leasing them to Debtor was for a
good business reason.  Therefore, the Court grants summary
judgment in favor of Defendant as to  548(a)(1)(A).

See In re Ameri P.O.S. Inc., 355 B.R. 876, 885 (Bankr. S.D. Fla. 2006); In re Trace

Intern. Holdings, Inc., 287 B.R. 98, 106 (Bankr. S.D.N.Y. 2002); see also In re Main

Poly, Inc., 317 B.R. 1 (Bankr. D. Me. 2004).

In connection with this summary judgment motion, HSH offered sworn

statements and documents that demonstrate the following: HSH, prior to June 2003, was

an established law firm specializing in labor law, with a long-standing client known as

Maintech; Maintech was in serious financial trouble; the Spitkos were guarantors on

certain loans; a confessed judgment had been entered against both Maintech and the

Spitkos; the Spitkos engaged a workout attorney to represent them and to negotiate on

their behalf; that attorney recommended that they continue to employ HSH for certain

matters as it would be less expensive and to pay them via retainer; and the Spitkos then

used a portion of a tax refund to tender five payments over a ten-month period, which

payments were used to pay for legal services billed to Maintech and to another debtor-

owned corporation known as Sentek.  HSH argues that it was not fraudulent for the

debtors to engage this law firm to represent them in their disputes with creditors.

The trustee offers no evidence to contradict that offered by the defendant.

Instead, he counters that a principal of HSH was the debtor's brother, that the debtors

29

were likely insolvent, and that HSH concedes that the use of retainer payments was

intended, at least in part, to prevent avoidance of such transfers. Trustee's Memorandum

at 12-13. This, the trustee concludes, is sufficient to infer that the payments made to HSH

were intended to hinder, delay and defraud the debtors' creditors.

I respectfully disagree. Even with the benefit of all reasonable inferences, I

cannot conclude that the trustee has offered sufficient indicia of fraud to warrant a trial on

this issue. Accordingly, summary judgment will be entered on Count II in favor of the

defendant.


B.


I reach a different conclusion as to Count III.

Under Pennsylvania law, "[a] transfer made or obligation incurred by a

debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the

obligation was incurred if the debtor made the transfer or incurred the obligation without

receiving a reasonably equivalent value in exchange for the transfer or obligation and the

debtor was insolvent at that time or the debtor became insolvent as a result of the transfer

or obligation." 12 Pa. C.S.A. § 5105; see generally In re Fidelity Bond and Mortg. Co.,

340 B.R. 266, 285-86 (Bankr. E.D. Pa. 2006).

By virtue of 11 U.S.C. § 544(b), a chapter 7 trustee may assert the state law

rights of a creditor to set aside a conveyance that is constructively fraudulent. See, e.g.,

In re Walter, 261 B.R. 139, 141-42 (Bankr. W.D. Pa. 2001); In re Allegheny Health,

Education and Research Foundation, 253 B.R. 157, 164 (Bankr. W.D. Pa. 2000) ("11

30

U.S.C. § 544(b)(1) allows the Trustee to pursue his action under 12 Pa. C.S.A. § 5104(a)(2) and 5105 against PHCT for the avoidance of the conveyances alleged by the Trustee to have been made provided that a creditor of Centennial exists, or creditors of Centennial exist, as of Centennial's petition filing date who then possessed identical causes of action against PHCT . . . ."); In re Nam, 257 B.R. 749, 760 (Bankr. E.D. Pa. 2000).  Moreover, the statute of limitations under PUFTA is four years.  12 Pa. C.S.A. § 5109; see In re Cowden, 337 B.R. 512, 521-22 (Bankr. W.D. Pa. 2006).  (Therefore, the trustee's Count III claim under PUFTA includes the June 2003 payment.)

In this adversary proceeding, the transfers made to HSH occurred after judgment was confessed by Wachovia Bank against the debtors.  As PUFTA defines insolvency as a balance-sheet calculation (i.e., liabilities exceed assets), 12 Pa. C.S.A. § 5102(a), along with a presumption of insolvency when the debtor is generally not paying his debts as they become due, 12 Pa. C.S.A. § 5102(b), the trustee may be able to prove at trial that the debtors were insolvent when they made these transfers.  Accordingly, the issue posed by HSH's present summary judgment motion focuses upon whether the debtors received reasonably equivalent value for their payments of $93,500 to the defendant.

Some courts have noted that while the trustee has the initial evidentiary burden under his PUFTA claim, under Pennsylvania law he can meet that burden simply by demonstrating the debtors' insolvency.  At that point, the evidentiary burden shifts to HSH, the transferee, to demonstrate that the transferors/debtors received reasonably equivalent value:

31

> Furthermore, although not necessary for our result, we note that the bankruptcy court erred in its "constructive fraud" analysis by incorrectly placing on Arch Street the burden of proving that reasonably equivalent value was <u>not</u> given for the transfer: "[W]e believe that lack of 'reasonably equivalent value' for the transfer is not proven . . . ." <u>Main III</u>, 1997 WL 626544, at *6.  In fact, if the grantor is in debt at the time of a transfer PUFTA places <u>on the grantee</u> the burden of proving by clear and convincing evidence either that the grantor was solvent at the time of the transfer or that the grantee had given reasonably equivalent value for the conveyance.

<u>In re Blatstein</u>, 192 F.3d 88, 98 (3d Cir. 1999) (dicta); <u>see</u> <u>Tiab Communications Corp. v. Keymarket of Nepa, Inc.</u>, 263 F. Supp. 2d 925, 937 (M.D. Pa. 2003) ("As Crystal (the grantor) was insolvent at the time of the Crystal-Keymarket transaction and had assumed Tiab's debt's [sic], the burden falls on Keymarket (the grantee) to show that it gave reasonably equivalent value for the station and license."); <u>see generally</u> <u>Koffman v. Smith</u> 453 Pa.Super. 15, 26-27 (1996) (applying a shifting burden standard under the former Uniform Fraudulent Conveyance Act).

Other decisions, relying upon non-uniform Comment 6 to 12 Pa. C.S.A. § 5102, <u>cf.</u> <u>Apple Storage Co. v. School Dist. of Philadelphia</u>, 4 Pa. Cmwlth. 55, 59 (1971) (comment made by governmental commission is considered when construing a state statute), hold that Pennsylvania law on this issue changed with the enactment of PUFTA, and (consistent with section 548) the plaintiff has the burden of persuasion on all elements of fraudulent conveyance, including reasonably equivalent value.  <u>In re C.F. Foods, L.P.</u>, 280 B.R. 103, 113-15 (Bankr. E.D. Pa. 2002); <u>see</u> <u>In re Kartman</u>, 354 B.R. 70, 79 (Bankr. W.D. Pa. 2006); <u>In re Dawley</u>, 2005 WL 2077074, at *13-*14 (Bankr. E.D. Pa. 2005).  If so, for purposes of summary judgment, it would be the trustee who

must establish that, at trial, he will prove that the Spitkos did not receive reasonably equivalent value for their payments to HSH.

No Pennsylvania appellate court has considered whether rulings under the repealed Pennsylvania Uniform Fraudulent Conveyances Act, holding that the evidentiary burden can shift to the transferee/defendant, were incorporated or altered by PUFTA. Compare Mussetter v. Lyke, 10 F. Supp. 2d 944, 961-62 (N.D. Ill. 1998) (California decisions under the Uniform Fraudulent Conveyance Act, shifting the evidentiary burden to transferees to demonstrate reasonably equivalent value, remain valid California law under the Uniform Fraudulent Transfer Act).  In this proceeding, however, I need not resolve that issue in order to adjudicate the present summary judgment motion.

It is undisputed that all of the invoices issued by HSH for legal services purportedly rendered and paid for by the Spitkos were directed either to Maintech or Sentek and not to the Spitkos.  These corporate invoices were paid from funds transferred by the individual debtors and held in escrow by HSH.  That fact alone would not preclude the defendant from demonstrating that the Spitkos received an adequate benefit from the legal services provided.  See generally In re National Century Financial Enterprises, Inc., 341 B.R. 198, 214-15 (Bankr. S.D. Ohio 2006).

For example, when considering the question of constructive fraudulent conveyance under section 548(a)(1)(B), courts have recognized that the benefit provided to the transferor may be either direct or indirect:

> [I]n evaluating whether reasonably equivalent value has been
> given the debtor under section 548, indirect benefits may also
> be evaluated.  If the consideration Metro received from the
> transaction, even though indirect, approximates the value it
> gave TCI, this can satisfy the terms of the statute.  See Rubin

> v. Manufacturers Hanover Trust Co., 661 F.2d 979, 991 (2d
> Cir.1981) (although transfers solely for the benefit of third
> parties do not furnish fair consideration, the transaction's
> benefit to the debtor need not be direct and may come through
> a third party).  These indirect economic benefits must be
> measured and then compared to the obligations that the
> bankrupt incurred.

Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 646-47 (3d Cir. 1991).

This analysis was applied to resolve a similar PUFTA claim.  See In re Fidelity Bond and

Mortgage Co., 340 B.R. 266, 287 (Bankr. E.D. Pa. 2006).

However, since the undisputed facts demonstrate that the debtors paid for

bills issued to a third party, at least a burden of production (if not persuasion) shifts,

requiring defendant HSH to demonstrate that the transferees received a reasonably

equivalent indirect benefit:

> In a three-way transfer like this one, once the plaintiff has
> shown that the transfer was for the benefit of a third-party, as
> Plaintiff here has done, courts place the burden on the
> defendant to prove that the debtor received "reasonably
> equivalent value" indirectly as a result of the transfer.

In re National Century Financial Enterprises, Inc., 341 B.R. at 216 (citation omitted).

In connection with the instant motion, HSH concedes that there would be

disputed factual issues concerning whether, solely by dint of the Spitkos' connection with

Maintech and Sentek, the benefits derived from legal services rendered to those

corporations indirectly constitute reasonably equivalent value to the debtors.  See

generally In re R.M.L., Inc., 195 B.R. 602, 618 (Bankr. M.D. Pa. 1996) ("Generally

transfers made or obligations incurred (including guarantees) solely for the benefit of

third parties do not furnish reasonably equivalent value. . . .  However, exceptions to the

general rule can be found where the debtor receives the benefit of the original

34

consideration . . . , or where the debtor and third party 'are so related or situated that they

share an identity of interests because what benefits one will, in such case benefit the other

to some degree.'") (quoting In re Pembroke Development Corp., 124 B.R. 398, 400

(Bankr. S.D. Fla. 1991)) (citations omitted); 5 Collier on Bankruptcy, ¶ 548.05, at 5-548

(15th ed. rev. 2006):

> Whether the transfer is for "'reasonably equivalent value'" in
> every case is largely a question of fact, as to which
> considerable latitude must be allowed to the trier of the facts.
> In order to determine if a fair economic exchange has
> occurred in a case of a suspected fraudulent transfer, the
> bankruptcy court must analyze all the circumstances
> surrounding the transfer in question.  Moreover, even if there
> was consideration for the transfer given to some entity,
> section 548(a)(1)(B) requires a transfer to be set aside if the
> debtor did not receive reasonably equivalent value.  Because
> the ultimate issue is the impact of the transfer on the debtor's
> estate, the court must thus determine whether the debtor, as
> opposed to some other entity, received such value.  The
> analysis in such cases is similar to that of cases under the
> UFCA which held that a debtor did not receive reasonably
> equivalent value if its transfer was in exchange for a benefit
> to a third party.

(footnotes omitted).

Despite recognizing the disputed nature of the question of reasonably

equivalent value in this factual context, HSH contends that because the Spitkos were

guarantors of claims made by Wachovia and De Lage Landen, any legal services it

rendered in connection with those creditor claims must benefit the debtors and thus

constitute reasonably equivalent value.  See generally In re Nirvana Restaurant Inc.,

337 B.R. 495, 502-03 (Bankr. S.D.N.Y. 2006); In re R.M.L., Inc., 195 B.R. at 618

("[P]ayments on an existing guarantee generally are considered to be for reasonably

equivalent value.").  Thus, the defendant reasons, summary judgment as to a portion of

35

count III is warranted: the invoices involving services concerning Wachovia and De

Lange Laden.

The defendant's contention overlooks, however, that it has redacted

information concerning the nature of the services provided in copies of some billings,

including the legal services purportedly attributable to the Wachovia and De Lage Landen

claims.  See, e.g., Ex. D, Bill dated February 27, 2004, lodestar entry 1/30/04 ("Research

the [redacted] 6.50 hrs.  $1007.50").  The trustee complains that, even if HSH provided

the services on the dates found in the billings, and even if these services were properly

apportioned to Wachovia or De Lage Landen litigation, he needs access to unredacted

billing records to assess the reasonableness of those services.  I agree:

> Counsel's time entries are heavily redacted. For example,
> many of the entries for telephone conferences and
> correspondence are redacted so that there is no indication of
> the subject of the communication.  Many of the research
> entries are redacted so that there is no indication of the topic.
> Synagro stated that the redactions were necessary to prevent
> disclosure of attorney-client privilege or work product
> material.  GMP objected, arguing that the redactions made it
> impossible for GMP to evaluate the reasonableness of the
> fees.  This Court agrees that the redactions significantly
> hampered review of the Motion.

Synagro Technologies, Inc. v. GMP Hawaii, Inc., 2007 WL 851271, at *13 (D. Haw.

2007); see also Essex Builders Group, Inc. v. Amerisure Ins. Co., 2007 WL 700851, at *2

(M.D. Fla. 2007):

> Amerisure contends that it should have access to the
> unredacted billing statements to determine the reasonableness
> of the fees sought by Essex.  The Court finds that it would be
> manifestly unfair to Amerisure to require it to defend against
> the sizeable fee award claimed by Essex without the benefit of
> the full record upon which the fees are based.

Given that HSH has some evidentiary burden concerning the reasonableness of its corporate billings, as they related to the benefit received by the debtors who paid for those services, it would be inappropriate to grant it summary judgment on Count III without affording the trustee an opportunity to examine unredacted documents. See also In re Porras, 312 B.R. 81, 103 (Bankr. W.D. Tex. 2004) (summary judgment denied where defendant has not revealed all information about the value received by the transferor).

In connection with a prior adversary proceeding in this bankruptcy case, I noted that not all courts agree that a chapter 7 debtor may assert the attorney-client privilege in bankruptcy matters. Some courts conclude that the privilege belongs to the chapter 7 debtor; others maintain that the trustee controls the privilege; and still others hold that the trustee controls the privilege for some types of bankruptcy litigation and the debtor for others. Compare Labovitz, Attorney-Client Privilege in Individual Bankruptcy Cases . . . An Emerging Oxymoron?, 104 Com. L.J. 301 (Fall 1999) with Thomas, Note, Fifteen Years After Weintraub: Who Controls The Individual's Attorney-Client Privilege in Bankruptcy?, 80 B.U. L. Rev. 635 (April 2000).[12]  As one bankruptcy court summarized:

> A Chapter 7 trustee's ability to waive the attorney-client
> privilege of an individual debtor is an issue of first impression
> before this Court. Several courts have struggled with the
> question. The most numerous, and most recent cases have

---

[12]This lack of uniformity stems from Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343 (1985). Although holding that a chapter 7 trustee controls the attorney-client privilege of a debtor-corporation, the Court stopped short of extending its holding to individual debtors, saying: "[O]ur holding today has no bearing on the problem of individual bankruptcy, which we have no reason to address in this case." Id. at 356.

> held that, at least under some circumstances, a trustee may
> waive the attorney-client privilege in an individual bankruptcy
> case.  Foster v. Hill (In re Foster), 188 F.3d 1259 (10th Cir.
> 1999) (holding that determination of trustee's control over
> privilege should be based upon a comparison of the harm to
> the debtor against the trustee's need for information); Ramette
> v. Bame (In re Bame), 251 B.R. 367 (Bankr. D. Minn. 2000)
> (holding that the trustee succeeded to privilege regarding all
> communications that were in regards to estate administration
> and that took place while the debtor was a debtor in
> possession); French v. Miller (In re Miller), 247 B.R. 704
> (Bankr. N.D. Ohio 2000) (holding that whether the trustee has
> the power to waive an individual debtor's privilege must be
> made on a case-by-case basis); Moore v. Eason (In re
> Bazemore), 216 B.R. 1020 (Bankr. S.D. Ga. 1998) (holding
> that trustee may waive privilege where no harm would come
> to the individual debtors and where waiver would not have a
> chilling effect on the attorney-client relationship); Whyte v.
> Williams (In re Williams), 152 B.R. 123 (Bankr. N.D. Tex.
> 1992) (holding that trustee had the power to waive privilege
> in the case of an individual debtor where the trustee sought to
> pursue avoidance causes of action).  But see In re Silvio De
> Lindegg Ocean Developments of America, Inc., 27 B.R. 28
> (Bankr. S.D. Fla. 1982) (holding that a trustee could not
> waive an individual debtor's privilege).

In re Eddy, 304 B.R. 591, 598 (Bankr. D. Mass. 2004).

I appreciate that, in this proceeding, the chapter 7 trustee is seeking to avoid

prepetition transfers made by the debtors as constructively fraudulent.  The Williams

decision, 152 B.R. 123, held that a bankruptcy trustee under a liquidating chapter 11 plan

should control the attorney-client privilege in order to prevent the insulation of fraudulent

transfers from avoidance.  See id. at 129-30.  The Tenth Circuit Court of Appeals later

analyzed Williams and noted that its reasoning would not apply in all individual

bankruptcy disputes:

> The trustee in Williams was investigating pre-petition
> transfers to the debtor's family. . . .  In letting the trustee
> control the privilege, the court stressed the fiduciary duty to

38

the bankruptcy estate Williams had voluntarily assumed by becoming a debtor-in-possession. . . .  It also noted that losing control of the privilege "[could] have no adverse effect on [him], although there [was] a potentially adverse effect on [his] family members." Id. at 129.  It discounted the latter effect, noting bankruptcy law not only "does not protect a debtor's insiders or affiliates from . . . avoidance litigation," but specifically creates "causes of action to avoid transfers to insiders." Id. at 129.  Williams thus relies on lack of harm to the debtor, a consent rationale based on his voluntary assumption of a fiduciary duty, and an anti-insider-fraud rationale.  None of those rationales applies in this case . . . .

In re Foster, 188 F.3d at 1268 (citations omitted).

Recently, a district court concluded that whether a bankruptcy trustee controlled an individual debtor's attorney-client privilege required a balancing of the benefit and harm under the given circumstances:

There is no doubt that access to Mr. Marker's individual attorney-client privilege could aid the Receiver significantly in uncovering hidden assets and carrying out her other duties. However, this does not end the inquiry.  Several courts, when confronted with a trustee's request to waive the attorney-client privilege of an individual debtor, have adopted a balancing approach: weighing the potential for harm to the individual debtor with the trustee's duty to maximize the value of the debtor's estate. [FN9] See Foster v. Hill (In re Hill), 188 F.3d 1259, 1268 (10th Cir.1999) (holding that determination of trustee's control over privilege should be based upon a comparison of the harm to the debtor against the trustee's need for information).

FN9. In cases where courts found that a trustee does not have the power to waive the attorney-client privilege of the individual, the court focused on the potential for personal harm to the debtor and the risk of chilling attorney-client communication.  See, e.g., In re Silvio, 27 B.R. 28 (Bankr. S.D. Fla. 1982) (where an individual who owned all the stock of bankrupt corporation also filed for bankruptcy, trustee could waive privilege of corporation

39

> because only fiscal loss of assets could arise,
> but could not waive for the individual because
> disclosure could involve criminal conduct).
> Courts that found that the trustee may waive the
> privilege of an individual debtor focused on the
> absence of any adverse effects on the debtor.
> See, e.g., In re Bazemore, 216 B.R. 1020, 1024-
> 25 (Bankr. S.D. Ga. 1998) (holding that trustee
> may waive privilege where no harm would
> come to individual debtors and where waiver
> would not have chilling effect on attorney-client
> relationship).
>
> In the present case, Mr. Marker is currently serving a sentence
> of one hundred and ten months in federal prison as a result of
> criminal convictions for securities, mail and wire fraud. It is
> very likely that Mr. Hamlet's files could contain information
> that would expose Mr. Marker to additional criminal charges.
> Therefore, after balancing the risk of harm to Mr. Marker
> against the Receiver's need for information, it is clear that this
> balancing test does not favor a finding that the Receiver
> controls Mr. Marker's individual attorney-client privilege.
> Thus, Mr. Hamlet does not have to disclose any confidential
> communications relating to his individual representation of
> Mr. Marker to the Receiver.

S.E.C. v. Marker, 2006 WL 288426, at *4 (M.D.N.C. 2006).

At oral argument, counsel for HSH represented that Carl Spitko was under indictment, and HSH feared that certain redacted information could affect any criminal charges brought against the debtor.  Given that potential harm, and given the willingness of HSH to provide unredacted billing information to the trustee upon a promise of confidentiality, the acceptance of that offer would balance the trustee's need for complete information in order to prosecute his avoidance claim with protection of the husband/debtor's interests.

Accordingly, HSH's  demand for summary judgment as to Count III will be denied.  In addition, the trustee will have access to complete billing information upon his signing of an appropriate confidentiality agreement.

An appropriate order shall be entered.

41

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                       :        Chapter 7

CARL SPITKO and                             :
ELIZABETH GOETZ SPITKO

            Debtors                         :        Bankruptcy No. 04-18836bif
_____

HOWARD T. GLASSMAN, trustee                 :

            Plaintiff                       :

      v.                                    :

HEIMBACH, SPITKO & HECKMAN                  :

            Defendant                       :        Adversary No. 05-0258
_____

.................................................

ORDER

.................................................

AND NOW, this 11th day of June 2007, for the reasons stated in the
accompanying memorandum, it is hereby ordered that defendant's amended motion for
partial summary judgment is granted as follows:

Summary judgment is entered in favor of the defendant and against the
plaintiff as to Counts I and II.  Summary judgment is denied as to Count III.

It is further ordered that, within 20 days from the date of this order, the
defendant shall provide the plaintiff with unredacted copies of its invoices to Maintech
and Sentek for the period of time beginning in June 2003 and ending in July 2004,
conditioned upon the plaintiff signing a confidentiality agreement as to those unredacted
invoices.

Finally, it is also ordered that trial on Count III shall take place on August

16, 2007 at 9:30 a.m. in Bankruptcy Courtroom #2.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

David M. Spitko, Esquire
Law Office of David Spitko
124 Drake Lane
North Wales, PA 19454

Kenneth J. LaFiandra, Esquire
Jacobs Law Group, P.C.
1800 JFK Blvd. Suite 404
Philadelphia, PA 19103

Ms. Barbara Townsend, Courtroom Deputy